✎JS 44 (TXND Rev. 2/10)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Jay Brandt, individually and on behalf of all others similarly situated

### DEFENDANTS
Toyota Motor Corporation and Toyota Motor Sales U.S.A., Inc.,

**(b)** County of Residence of First Listed Plaintiff   Dallas
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Foreign
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Roger L. Mandel, Beckham & Mandel, 3400 Carlisle, Suite 550, Dallas, Texas 75204

Attorneys (If Known)

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

☐ 1   U.S. Government
Plaintiff

☐ 3   Federal Question
(U.S. Government Not a Party)

☐ 2   U.S. Government
Defendant

☒ 4   Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                      and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☒ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN   (Place an "X" in One Box Only)

☒ 1   Original
Proceeding

☐ 2   Removed from
State Court

☐ 3   Remanded from
Appellate Court

☐ 4   Reinstated or
Reopened

☐ 5   Transferred from
another district
(specify)

☐ 6   Multidistrict
Litigation

☐ 7   Appeal to District
Judge from
Magistrate
Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. 1332(a)(1)and(d)
Brief description of cause:
Warranty claims against car manufacturer

## VII. REQUESTED IN COMPLAINT:
☑ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☑ Yes   ☐ No

## VIII. RELATED CASE(S) PENDING OR CLOSED:   (See instructions)

JUDGE

DOCKET NUMBER

DATE   04/19/2010

SIGNATURE OF ATTORNEY OF RECORD   *Roy J. Mandel*

## FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

JS 44 Reverse (TXND Rev. 2/10)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I. **(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)."

II. **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), Fed. R. Civ. P., which requires that jurisdiction be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers, or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress, or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 US.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

III. **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV. **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

V. **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C, Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

VI. **Cause of Action** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity** Example     U.S. Civil Statute: 47 USC 553
Brief Description: Unauthorized reception of cable service

VII. **Requested in Complaint**. Class Action. Place an "X" in this box if you are filing a class action under Rule 23, Fed. R. Civ. P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand, such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII. **Re lated Cases**. This section of the JS 44 is used to reference cases that are related to this filing, if any. If a related case exists, whether pending or closed, insert the docket numbers and the corresponding judge names for such cases. A case is "related" to this filing if the case: (1) involves some or all of the same parties and is based on the same or similar claim; (2) involves the same property, transaction, or event; (3) involves substantially similar issues of law and fact; and/or (4) involves the same estate in a bankruptcy appeal.

**Date and Attorney Signature**. Date and sign the civil cover sheet.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| JAY BRANDT,<br>individually and on behalf of all others<br>similarly situated,<br><br>    Plaintiffs,<br><br> v.<br><br>TOYOTA MOTOR CORPORATION and<br>TOYOTA MOTOR SALES U.S.A., Inc.,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL NO:_____<br><br><br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

TO THE HONORABLE COURT:

Plaintiff Jay Brandt, on behalf of himself and all other persons similarly situated, by the undersigned attorneys, alleges the following based on his personal knowledge as to himself and his own acts and on information and belief as to all other matters.

## NATURE OF ACTION

1.     Plaintiff brings a class action arising from Defendants' design, manufacture and sale of defective and unreasonably dangerous automobiles.  The defects complained of herein resulted in the unintended and unstoppable acceleration of a broad range of automobiles.  Following a highly publicized car crash of a Lexus ES 350 manufactured by Defendants, on August 28, 2009, that killed a California Highway Patrol officer and three passengers, Defendants began a series of mass recalls, ultimately encompassing more than 8 million automobiles worldwide.  While Defendants claim that they acted appropriately in responding to a potential design defect, Defendants in fact knew of such a problem for over a decade in its manufacture of Toyota automobiles.

2.     On September 29, 2009, Defendants recalled 3.8 million automobiles installed with "all weather" floor mats (the "Floor Mat Recall").  The Floor Mat Recall was initiated to address the risk that certain floor mats could trap the accelerator pedal in an open position.  The Floor Mat Recall asked all owners of certain vehicles to remove the "all weather" floor mats in their vehicles until a remedy was found.  However, the NHTSA disagreed with Defendants by stating that the Floor Mat Recall failed to adequately resolve the underlying defect associated with the accelerator pedals.  In early January 2010, Toyota expanded the scope of the Floor Mat Recall to include, in total, approximately 4.2 million automobiles.  Thereafter, on January 21, 2010, Toyota announced an additional recall of 2.3 million automobiles to address "the

possibility that certain accelerator pedal mechanisms may, in rare instances, mechanically stick in a partially depressed position . . ." (the "Accelerator Recall"). The Accelerator Recall encompassed many of the same models included in the Floor Mat Recall announced on November 2, 2009, as well as some additional models not originally included in the Floor Mat Recall.

3.      Shortly after announcing the Accelerator Recall, Toyota suspended the sale and manufacture of the eight models covered by the Accelerator Recall, stating that this drastic move "is necessary until a remedy is finalized." However, Toyota did not suggest that owners of the automobiles included in the Accelerator Recall stop driving the cars unless "you feel you are experiencing this condition," which Defendants described as the "accelerator pedal is hard to depress, slow to return or is unsmooth during operation."

4.      Defendants' unreasonably dangerous design of its floor mats, accelerator pedals and electronic throttle control, failure to provide adequate safety precautions, and pattern of obfuscation and delay in promulgating recalls created an unreasonable risk of serious injury to its consumers.

## JURISDICTION AND VENUE

5.      Pursuant to 28 U.S.C. §§ 1332(a)(1) and (d), this Court has jurisdiction over the controversy because there is diversity of citizenship, the action is filed as a class action, the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and more than two-thirds of the class members are citizens of a state other than that of Defendants.

6.      Venue lies in this District, pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this Judicial District. In addition, Defendants do business and/or transact business in this Judicial District, and,

therefore, they are subject to personal jurisdiction in this Judicial District and reside here for venue purposes.

## PARTIES

7.      Plaintiff Jay Brandt ("Brandt" or "Plaintiff") is a resident of Dallas, Texas.  In 2010, Brandt purchased a 2009 Lexus 350 ES Sedan from Sewell Lexus in Dallas, Texas.

8.      Defendant Toyota Motor Corporation ("Toyota") is the world's largest automaker and the largest seller of automobiles in the United States.  Toyota is a Japanese Corporation headquartered in Toyota City, Aichi Prefecture, Japan.

9.      Defendant Toyota Motor Sales, U.S.A., Inc. ("Toyota U.S.A.") is a wholly-owned subsidiary of Toyota Motor Corporation and is responsible for the marketing, sales and distribution in the United States of automobiles manufactured by Toyota Motor Corporation. Toyota U.S.A. is, and was at all relevant times, a California corporation headquartered in Los Angeles County, California.

## FACTUAL ALLEGATIONS

10.      Toyota is the world's largest automaker and the largest seller of automobiles in the United States.  Toyota is a Japanese corporation headquartered in Toyota City, Aichi Prefecture, Japan.

11.      Toyota U.S.A. is a wholly owned subsidiary of Toyota and is responsible for the marketing, sales and distribution in the United States of automobiles manufactured by Toyota. Toyota U.S.A. is headquartered in Los Angeles County, California.

12.      Toyota and Lexus automobiles have long had a strong reputation for quality, reliability and safety.  Defendants have relied on this reputation in the marketing and sales of Toyota and Lexus automobiles and have reaped the benefits of that reputation.  Indeed, as noted

in an article published on February 5, 2010, in *USA Today*, "Toyota has not only been able to maintain historically high resale values by building dependable cars. It didn't have to discount them heavily in order to sell them new . . . ." Similarly, a December 23, 2009 article published by the *Los Angeles Times* noted that Toyota's "peerless reputation for quality and safety has helped Toyota become the world's largest automaker."

13.     Defendants sought to maintain that public perception of quality for years, even as they became aware of numerous, terrifying and deadly automobile crashes involving sudden and uncontrolled acceleration in a wide variety of Toyota and Lexus automobiles. Indeed, Defendants successfully hid these incidents from the public at large until the summer of 2009, when a fiery car crash brought enhanced scrutiny on the brands.

14.     On August 28, 2009, a two-car collision in San Diego, California killed the driver and three passengers of a Lexus ES 350 ("the Saylor crash"). In the seconds before the Lexus careened off the road at speeds exceeding 120 miles per hour, a passenger in the Lexus called a 911 emergency dispatcher, reporting that the automobile's accelerator pedal was stuck and that the driver, California Highway Patrol Officer Mark Saylor, was unable to slow or stop the automobile. The ensuing publicity regarding the Saylor crash brought renewed attention to claims of unintended and unstoppable acceleration involving a wide range of automobiles designed and/or manufactured by Toyota. The Saylor crash also triggered an investigation by the National Highway Traffic Safety Administration ("NHTSA").

**THE FLOOR MAT RECALL**

15.     Two years before the Saylor crash, on September 26, 2007, Toyota announced that it was recalling approximately 55,000 sets of heavy-duty "all-weather" rubber floor mats installed in 2007 and 2008 Toyota Camry and Lexus ES 350 sedans. This recall came in

response to a NHTSA investigation that concluded that floor mat entrapment was the cause of numerous recent fatal automobile crashes. Toyota waited until September of 2007 to issue this recall even though it had learned that floor mats could entrap accelerator pedals as early as February 7, 2006. In announcing this limited recall, Toyota made no reference to the design or manufacture of the accelerator pedal used in either the Toyota Camry or the Lexus ES 350, despite learning of a problem with sticking pedals in approximately July of 2006.

16.     On September 25, 2009, the NHTSA released a safety investigation report relating to the Saylor crash. In its report, the NHTSA determined that the design of the accelerator pedal in the Lexus ES 350 contributed to the accident because the pedal design included "no means for relieving forces caused by interferences[.]", including interference caused by floor mats.

17.     On September 29, 2009, Toyota issued repair instructions for sticking accelerator pedals to its distributors in 31 European countries and Canada in order to address complaints about sticking accelerator pedals and sudden increases in vehicle acceleration. Toyota did not, at that time, inform NHTSA of its awareness of problems with sticking accelerator pedals. Rather, it maintained to NHTSA that the problems with sudden acceleration had to do with loose floor mats.

18.     Consistent with this position, in October of 2009, Toyota issued a safety warning to approximately 3.8 million vehicles to address the risk that floor mats could trap the accelerator pedal in an open position. However, as Toyota had no remedy for such entrapment, the notice asked all owners of affected Toyota vehicles to remove the mats or risk a forced down accelerator pedal that could lead to a fatal crash.

19.     Thereafter, in January of 2010, Toyota dramatically increased the scope of the Floor Mat Recall, extending it to cover approximately 4.3 million automobiles, including the following models:

- 2007-2010 Lexus ES 350
- 2006-2010 Lexus IS 250/350
- 2009-2010 Pontiac Vibe (manufactured for Pontiac by a joint venture between Toyota and General Motors)
- 2005-2010 Toyota Avalon
- 2007-2010 Toyota Camry
- 2009-2010 Toyota Corolla
- 2008-2010 Toyota Highlander
- 2009-2010 Toyota Matrix
- 2004-2009 Toyota Prius
- 2005-2010 Toyota Tacoma
- 2007-2010 Toyota Tundra
- 2009-2010 Toyota Venza
- 2009-2010 Pontiac Vibe

20.     This expanded recall included many of Toyota's most popular and best selling automobiles.

21.     In announcing the original recall, Toyota blamed the acceleration problems on installed floor mats, stating, *"No Defect Exists in Vehicles with Properly Installed Floor Mats"* and further claiming that:

[t]he question of unintended acceleration involving Toyota and Lexus vehicles has been repeatedly and thoroughly investigated by NHTSA, without any finding of defect other than the risk from an unsecured or incompatible driver's floor mat[.]

22.     Toyota's announcement was directly contradicted by a November 4, 2009 statement from the NHTSA in which the NHTSA took Toyota to task, stating that:

A press release put out by Toyota earlier this week about their recall of 3.8 million Toyota and Lexus vehicles *inaccurately* stated NHTSA had reached a conclusion "that no defect exists in vehicles in which the driver's floor mat is compatible with the vehicle and properly secured." NHTSA has told Toyota and consumers that removing the recalled floor mats is the most immediate way to address the safety risk and avoid the possibility of the accelerator becoming stuck. But it is *simply an interim measure. This remedy does not correct the underlying defect in the vehicles* involving the potential for entrapment of the accelerator by floor mats, which is *related to accelerator and floor pan design*. Safety is the number one priority for NHTSA and this is why officials are working with Toyota to find the right way to fix this very dangerous problem. This matter is not closed until Toyota has effectively addressed the defect by providing a suitable vehicle based solution.

(emphasis added). The NHTSA further noted that while the recall announced in October of 2009, "focuses on pedal entrapment by floor mats," the NHTSA would "fully investigate any possible defect trends in these vehicles."

23.     On November 25, 2009, Toyota issued a press release announcing a remedy for the floor mat interference. This remedy included changing the shape of the accelerator pedal and reconfiguring the floor surface underneath the floor mat. Additionally, an override system to cut engine power in case of simultaneous application of both the accelerator and brake pedals would be installed on the affected automobiles. However, these remedies would not be available until at least another month for three Toyota models, and on a "rolling schedule during 2010" for the remaining five models. Thus, owners of the Recalled Automobiles were being told that they would have to continue to drive dangerously defective cars.

**THE ELECTRONIC THROTTLE CONTROL SYSTEM**

24.     Beginning in the early 2000's, Toyota began manufacturing certain automobiles with an Electronic Throttle Control system ("ETC"). In an automobile with an ETC system, an electronic signal is sent from the gas pedal to the engine when the gas pedal is depressed. A sensor at the accelerator detects the relative position of the gas pedal and transmits that information to a computer module, which controls the motorized engine throttle. The computer module determines how far the accelerator is depressed and tells the engine throttle motor how far to open the throttle valve.

25.     When Toyota introduced the ETC system, it included traditional mechanical linkage between the accelerator and the engine throttle control. The mechanical linkage system served a redundant safety measure in the event of unintended acceleration by the ETC system.

In the event of unintended acceleration, the ETC system would disconnect the ETC and automatically allow the throttle to be controlled by the mechanical linkage.

26.    In 2001, Toyota began manufacturing automobiles without the mechanical linkage.  The absence of the mechanical linkage, coupled with Toyota's increased use of electronic ignition buttons in place of traditional key-turned ignition switches, meant that there was no easy mechanical means by which the driver could turn off the engine in case of unintended acceleration.

27.    In addition, Toyota automobiles, prior to February of 2010, did not include a brake-to-idle system, by which power to the engine is automatically cut when the brake pedal and the accelerator are depressed simultaneously.  Brake-to-idle safety systems are commonly used in German automobiles.

28.    The factors illustrated above contributed to a substantial risk to drivers and passengers of Toyota automobiles because of a risk of unintended acceleration and the absence of adequate safety measures.

**THE ACCELERATOR RECALL**

29.    Before the year 2010, Toyota had received thousands of complaints of unintended acceleration alleged to be the product of an unreasonably dangerous accelerator design.  In fact, Toyota automobiles accounted for 33 percent of all unintended acceleration complaints filed with the National Highway Traffic and Safety Administration in the year 2009.  On January 19, 2010, despite having already issued repair procedures in Europe and Canada on September 29, 2009, Toyota finally informed the NHTSA that accelerator pedals made by one if its manufacturers, CTS Corporation may have a dangerous "sticking" defect.  On January 21, 2010, Toyota issued a press release stating that it would recall an additional 2.3 million automobiles.  This recall was

"separate from the on-going recall of approximately 4.2 million Toyota and Lexus vehicles to reduce the risk of pedal entrapment by... floor mats." This new recall addressed a condition that "can occur when the pedal mechanism becomes worn and, in certain conditions, the accelerator pedal may become harder to depress, slower to return or, in the worst case, stuck in a partially depressed position." According to the press release, this defect was discovered when Toyota was investigating reports of sticking accelerator pedals "without the presence of floor mats."

30.     The January 21, 2010 press release noted that Toyota had not yet developed a solution to the defect underlying the Accelerator Recall.  As a result, owners subject to the Accelerator Recall could not bring their car to dealerships for repairs, which left the owners of the following automobiles in the position of having to drive unreasonably dangerously automobiles:

- 2005–2010     Toyota Avalon
- 2007–2010     Toyota Camry (excluding the Toyota Camry Hybrid)
- 2009–2010     Toyota Corolla
- 2010   Toyota Highlander (excluding the Toyota Highlander Hybrid)
- 2009–2010     Toyota Matrix
- 2009–2010     Toyota RAV4
- 2008–2010     Toyota Sequoia
- 2007–2010     Toyota Tundra

31.     On January 26, 2010, Toyota issued a press release announcing that it would suspend all new sales of automobiles affected by the Accelerator Recall until a remedy was available.

32.     On January 29, 2010, Defendants expanded the scope of the Accelerator Recall to include the following models:

- 2008–2009     Toyota Highlander (excluding the Toyota Highlander Hybrid)

- 2009-2010     Toyota Venza

31.     Given that Toyota had received approximately 2,000 complaints of unintended acceleration, it is clear that Toyota failed to properly and appropriately investigate these incidents and to implement appropriate remedies while being on notice of the defects in its automobiles.

32.     Toyota has also failed to include in its recall Toyota hybrid automobiles such as the Camry Hybrid, which Plaintiff alleges upon information and belief suffers from the same dangerous unintended acceleration defect.

**INEFFECTIVE RECALLS**

33.     Prior to and, remarkably, during the course of the Floor Mat Recall and Accelerator Recall, Defendants attempted to delay, minimize or avoid public disclosure of potential problems and defects with Toyota automobiles.  As noted in a December 23, 2009 article in the *Los Angeles Times*:

> . . . even as its sales have soared, the company has delayed recalls,
>
> kept a tight lid on disclosure of potential problems and attempted
>
> to blame human error . . . .

The *Los Angeles Times* article went on to refer to Defendants' misleading statements in the wake of the Floor Mat Recall:

> After Toyota announced its biggest recall to address the sudden-acceleration problem, it insisted publicly that no defect existed. This drew a rare public rebuke from the National Highway Traffic Safety Administration, which chastised the automaker for making 'inaccurate and misleading statements.'

34.     Remarkably, Defendants have been aware of sudden acceleration problems in their automobiles for approximately a decade, as disclosed by the *Los Angeles Times* in a November 29, 2009 article:

> The Times found that complaints of sudden acceleration in many Toyota and Lexus vehicles shot up almost immediately after the automaker adopted the so-called drive-by-wire system over the last decade.

> * *

> For some Toyota models, reports of unintended acceleration increased more than fivefold after drive-by-wire systems were adopted, according to the review of thousands of consumer complaints filed with the National Highway Traffic Safety Administration.

35.     Indeed, in the December 23, 2009 article, the *Los Angeles Times* noted that while the sudden acceleration problem had only recently become widely known to the public, Defendants had undertaken issued numerous recalls relating to the issue in the past:

> Although the sudden acceleration issue erupted publicly only in recent months, it has been festering for nearly a decade. A

computerized search of NHTSA records by The Times has found Toyota issued eight previous recalls related to unintended acceleration since 2000, more than any other automaker.

36.     On April 5, 2010, NHTSA proposed a record and maximum possible civil penalty of $16.4 million against Toyota for its failure to notify NHTSA of the accelerator pedal defect within 5 days of its discovery as required by the law.  In discussing the fine, the United States Transportation Secretary Ray LaHod specifically cited to Toyota's notification of European and Canadian distributors of an accelerator pedal problem on September 29, 2009.  As quoted in the *Washington Post* on April 6, 2010, Transportation Secretary LaHod stated, "we now have proof that Toyota failed to live up to its legal obligations."  "Worse yet, they knowingly hid a dangerous defect for months from U.S. officials and did not take action to protect millions of drivers and their families."

37.     As a result of this pattern of obfuscation and delay, Defendants have put the health and safety of their customers, including Plaintiff and the Class, at risk.

38.     Further, by failing to disclose sudden acceleration risks, Defendants have effectively duped millions of Americans into purchasing potentially unsafe and now substantially less valuable automobiles.  In addition to the risks inherent in driving automobiles affected by the sudden acceleration defect, Plaintiff and the Class have suffered direct economic harm in the form of decreased resale values for automobiles included in the various recalls. As a February 5, 2010 article in *USA Today* noted, "Toyota owners could get walloped on their expected resale value over the automaker's alleged safety lapses."  Indeed, in direct response to the recalls, the publicity surrounding them, and concerns regarding Toyota's handling of the recalls, in early February 2010, Kelley Blue Book, an industry-leading analyst of used automobile values,

lowered its published resale values of used Toyota automobiles twice in one week, resulting in an average decline in resale value of 3.5%.

39.     According to an article by *The New York Times* on April 6, 2010, Toyota and Lexus dealers have worked on 1.7 million vehicles under the four recalls so far. However, and also according to the April 6, 2010 *New York Times* article, dozens of Toyota and Lexus owners who have had their cars "fixed" in the recalls have complained of more problems with their vehicles surging forward unexpectedly.

## FACTS SPECIFIC TO NAMED PLAINTIFF

40.     On February 23, 2010, Plaintiff Jay Brandt purchased a 2009 Lexus ES 350 from Sewell Lexus in Dallas, Texas. Plaintiff's automobile falls within the Floor Mat Recall. At the time he purchased the car, Plaintiff was not aware of any issues relating to unintended acceleration with Lexus automobiles.

41.     On April 8, 2010, on behalf of himself and of a class of all persons or entities in the United States whose automobiles were or subsequently are recalled by Toyota due to issues concerning unattended acceleration, Plaintiff gave notice to Defendants, through their attorney, of their breaches of implied warranties and requested them to cure those breaches, including fixing Plaintiff's and the Class' vehicles and compensating them for the diminution in value of their vehicles. As of the date of the filing of this Complaint, Defendants have not responded to Plaintiff's notice.

## CLASS ACTION ALLEGATIONS

42.     Plaintiff brings this class action on behalf of himself and all others similarly situated as members of the proposed nationwide plaintiff class (the "Class"). The proposed Class which Plaintiff seeks to represent includes:

all persons or entities in the United States whose automobiles were or subsequently are recalled by Toyota due to issues concerning unintended acceleration.  Excluded from the Class are defendants and their subsidiaries, affiliates, officers, directors and any legal representative, heir, successor, or assignee.

43.     This action has been brought and may properly be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b) (3).

44.     The members of the Class are so numerous that joinder of all members is impracticable.  The exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery.  However, Plaintiff is informed and believes, and on that basis alleges, that millions of persons, including the owners of the more than four million automobiles encompassed by the various recalls related to sudden, unintended acceleration, are members of the Class.  The precise number of Class members and their addresses are unknown to Plaintiff.  Class members may be notified of the pendency of this action by published and/or mailed notice.

45.     There is a well-defined community of interest in the questions of law and fact affecting the parties represented in this action.

46.     Common questions of law and fact exist as to all members of the Class.  Among others, these common questions include, but are not limited to:

    a. whether defendants' conduct constituted a breach of the implied warranty of merchantability;

    b. whether defendants' conduct constituted a breach of the implied warranty of fitness for a particular purpose;

c.  whether defendants' conduct make them liable under 15 U.S.C. § 2310(d).

d.  whether defendants were unjustly enriched by the misconduct described herein;

e.  whether defendants breached an implied contract with Class members; and

f.  whether, as a result of the misconduct alleged herein, Plaintiff and the Class are entitled to damages, injunctive relief and other remedies, and if so, the amount of such damages and the nature of such relief.

47.   These common questions predominate over any questions affecting only individual Class members.

48.   Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct and assert the same legal theories.  Plaintiff has no interests antagonistic to the interests of the other members of the Class.  Plaintiff and all members of the Class have sustained economic injury arising out of Defendants' violations of common and statutory law as alleged herein.

49.   Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the members of the Class he seeks to represent; he has retained counsel competent and experienced in complex class action litigation; and Plaintiff intends to prosecute this action vigorously.  Plaintiff and his counsel will fairly and adequately protect the interests of all of the members of the Class.

50.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the

wrongs done to them. There will be no difficulty in the management of this class action, whereas individualized litigation presents the potential for inconsistent or contradictory judgments. A class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, comprehensive supervision by a single court and the conservation of scarce judicial resources.

51.     As a proximate result of the wrongful conduct described herein, Plaintiff and all the members of the Class suffered damages.

52.     Plaintiff and members of the class are entitled to compensatory damages, equitable and declaratory relief, costs, and reasonable attorneys' fees.

## COUNT I

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

53.     Plaintiff re-alleges all of the allegations of paragraphs 1 through 52 as if fully set forth herein.

54.     Defendants marketed, sold, and distributed automobiles for use by Plaintiff and the members of the Class. Defendants were merchants with respect to the automobiles they sold. Therefore, Defendants impliedly warranted that the automobiles sold were fit for their ordinary purposes.

55.     The automobiles, by virtue of their floor mats, accelerator pedal and/or ETC, are subject to unintended acceleration and were defective, unmerchantable, and unfit for ordinary use when they were sold and delivered, as they are unable to perform their ordinary purposes with reasonable safety.

56.     Plaintiff notified Defendants on his own behalf and on behalf of the proposed Class of the defects in their automobiles on April 8, 2010, which was a reasonable time after Plaintiff discovered the breaches.

57.     As a direct and proximate cause of Defendants' breach of the implied warranty of merchantability, Plaintiff and the other members of the Class have sustained and will continue to sustain economic losses and consequential damages, and they are therefore entitled to recover compensatory damages and equitable and declaratory relief according to proof.

## COUNT II

## BREACH OF THE IMPLIED WARRANTY
## OF FITNESS FOR A PARTICULAR PURPOSE

58.     Plaintiff re-alleges all of the allegations of paragraphs 1 through 52 as if fully set forth herein.

59.     Defendants marketed, sold, and distributed automobiles for use by Plaintiff and the members of the Class.  Defendants were merchants with respect to the automobiles they sold.

60.     At the time of the manufacture and sale of the automobiles to the Plaintiff and Class members, Defendants had reason to know that Plaintiff and the members of the Class were relying on the Defendants to purchase automobiles free from unreasonably dangerous defects and that they purchased the automobiles for that particular purpose.

61.     Defendants impliedly warranted that the automobiles sold to Plaintiff and Class members were free from unreasonably dangerous defects, such as the potential for unintended acceleration resulting from the design and or manufacture of the floor mats and/or accelerator pedals and/or ETC, and thus were suitable for safe use by Plaintiff.

62.     Plaintiff and the other members of the Class relied on the Defendants' superior skill or judgment as the largest automobile manufacturer in the world to select the automobiles thus purchased.

63.     Plaintiff notified Defendants on his own behalf and on behalf of the proposed Class of the defects in their automobiles on April 8, 2010, which was a reasonable time after Plaintiff discovered the breaches.

64.     As a direct and proximate cause of Defendants' breach of the implied warranty of fitness for a particular purpose, Plaintiff and the other members of the Class have sustained and will continue to sustain economic losses and consequential damages, and thus are therefore entitled to recover compensatory damages and equitable and declaratory relief according to proof.

## COUNT III

## DAMAGES UNDER THE MAGNUSON-MOSS ACT

65.     Plaintiff re-alleges all allegations of paragraphs 1 through 64 as if fully set forth herein.

66.     In satisfaction of 15 U.S.C. § 2310(e), Plaintiff gave notice to Defendants of their breaches of implied warranties and a reasonable opportunity to cure such breaches on behalf of himself and the proposed Class.

67.     As a result of their breaches of the implied warranties of merchantability and fitness for a specific purpose, Defendants are liable to Plaintiff and the Class for damages, other legal and equitable relief, and the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) reasonably incurred by Plaintiff and the Class for and in connection with the prosecution of this action pursuant to 15 U.S.C. § 2310(d)(1) & (2).

## COUNT IV

## UNJUST ENRICHMENT

68.     Plaintiff re-alleges all allegations of paragraphs 1 through 52 as if fully set forth herein.

69.     Defendants received benefits from Plaintiff and the members of the Class when they purchased automobiles subject to the unintended acceleration defect.

70.     By failing to disclose true scope and cause of the risk of sudden, unintended, and unintended acceleration in said automobiles, Defendants have been unjustly enriched by Plaintiff and Class members' purchases of Defendants' automobiles.

71.     As a direct and proximate result of the foregoing, Plaintiff and the members of the Class have suffered damages.   Plaintiff and the Class members are entitled to recover compensatory damages, equitable and declaratory relief, punitive damages, costs, and reasonable attorneys' fees.

## COUNT V

## BREACH OF CONTRACT

72.     Plaintiff re-alleges all allegations of paragraphs 1 through 52 as if fully set forth herein.

73.     The essential elements of a contract are an offer, acceptance, and consideration. The existence and terms of the contract are implied by the conduct of the parties.

74.     An offer, acceptance, and consideration for the sale of automobiles existed, evidenced by the fact that Plaintiff and Class members paid money to Defendants in exchange for automobiles.  The act of exchanging money for automobiles was an offer and acceptance, and the money and automobiles exchanged constituted consideration.

75.     An implied term of the sale was that Defendants would provide automobiles that did not contain an unreasonably dangerous condition.   There was a meeting of the minds regarding the absence of unreasonably dangerous conditions.   The absence of unreasonably dangerous defects was a material term to the contracts.

76.     Defendants breached the implied terms of their contracts for sale of automobiles by providing automobiles that contained unreasonably dangerous defects.

77.     Plaintiff and Class members suffered and will continue to suffer damages as a proximate result of Defendants' breach of contract.

## REQUEST FOR RELIEF

Individually and on behalf of the Class, Plaintiff respectfully requests that the Court award the following relief:

a.   An order certifying the proposed Class under Fed. R. Civ. P. 23(b)(2) and (3) and appointing Plaintiff and Plaintiff's counsel to represent the Class;

b.   A judgment finding that Defendants are liable under all legal claims asserted herein;

c.   A judgment awarding damages to Class members under the causes of action alleged herein, including compensatory and consequential damages, punitive damages, and any other damages provided under the law;

d.   A judgment awarding attorneys' fees and litigation costs;

e.   A judgment awarding pre-judgment and post-judgment interest at the maximum rates allowable at law or in equity; and

f.   A judgment awarding all such other legal or equitable relief as justice requires.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: April 19, 2010

Roger L. Mandel
State Bar No: 12891750
Blake L. Beckham
State Bar No: 02016500

**Beckham & Mandel**
3400 Carlisle Street, Suite 550
Dallas, Texas 75204
Telephone:  (214) 965-9300
Facsimile:   (214) 965-9301
roger@beckham-mandel.com

Attorneys for Plaintiff